Filed 9/2/21  In re J.W. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.W., a Person Coming Under the Juvenile Court Law. | B310298 (Los Angeles County Super. Ct. No. 19CCJP02345A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AMBER M.,<br><br>    Defendant and Appellant. | |

APPEAL from an order the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge. Affirmed.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

The juvenile court terminated a mother's parental rights over her two-year-old daughter after 18 months of reunification services. The mother argues that the court erred in (1) summarily denying her pretermination petition to reinstate reunification services, and (2) finding that the Indian Child Welfare Act (Welfare and Institutions Code section 225 et seq.; 25 U.S.C. § 1901 et seq.)[1] (ICWA) did not apply. Neither argument has merit, so we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

In 2018, Amber M. (mother) gave birth to J.W.; J.W.'s father is Jeremy W. (father).

Prior to J.W.'s birth, father suffered a juvenile adjudication for shooting at a peace officer, multiple convictions for being a felon in possession of a firearm, and a conviction for carrying a concealed dirk or dagger.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

In November 2018, father went to his mother's house (the paternal grandmother), threatened to kill her and her dogs, and brandished a gun. Although J.W. was not present, father's younger brother—who was a minor—was.

In December 2018, mother was incarcerated in Texas on drug charges. Mother arranged to have father and paternal grandmother care for J.W. until her anticipated release in June 2019.

## II.    Procedural Background

### A.    *Petition*

In April 2019, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over J.W. In the operative, first amended petition, the Department alleged that jurisdiction was appropriate due to (1) father's "aggressive and assaultive behaviors," including the November 2018 incident, which placed J.W. "at risk of serious physical harm, damage and danger" (thereby rendering jurisdiction appropriate under section 300, subdivisions (a) and (b)(1)), and (2) mother's "inappropriate plan for [J.W.'s] care and supervision" by leaving J.W. with father during her incarceration, despite knowing of father's criminal history, which placed J.W. "at risk of physical and emotional harm and damage and failure to protect" (thereby rendering jurisdiction appropriate under section 300, subdivisions (b)(1) and (g)).

### B.    *Detention, jurisdiction, and disposition*

In April 2019, the juvenile court detained J.W. from father and placed her with paternal great-grandmother, and subsequently with a maternal cousin.

In July 2019, mother entered a no contest plea to an amended allegation that she "made an inappropriate plan for [J.W.'s] ongoing care and supervision" by leaving her with father, despite his "history of aggressive and assaultive behavior" and "criminal history," which "placed" J.W. "at risk of serious physical harm" (thereby rendering jurisdiction appropriate under section 300, subdivision (b)(1)).[2]

The court removed J.W. from mother and father. The court also ordered mother to (1) complete eight random or on-demand drug tests, and if she missed any test or tested positive, to participate in a full rehabilitation program with random testing, (2) complete a parenting course, and (3) participate in individual counseling to address "child safety and mother's criminal history." The court ordered monitored visits between J.W. and mother.

## C. *Progress during 18 months of reunification services*

The Department provided mother with reunification services from July 2019 through October 2020.

### 1. *Mother's progress with case plan*

During that period, mother's progress on her case plan was mixed. Mother failed to appear for drug testing seven times, and of the times she did appear, she had some negative tests, but also tested positive for marijuana nine times, tested positive for methamphetamines once, and tested positive for alcohol once. Given these test results, mother was required to complete a drug rehabilitation program, and she ultimately did so. However, she was arrested in February 2020 for possessing a controlled

---

[2] The court sustained the allegation against father under subdivision (b)(1), but father is not a party to this appeal.

substance, but reported to the Department that a friend had some pills and said it was only a misdemeanor.  Mother completed a parenting course.  Mother also enrolled in individual counseling, but the counselor was evasive about—and the Department could not verify—his qualifications, and the counselor provided no concrete details regarding mother's treatment goals or growth.

### 2. *Mother's new behaviors*

Around the same time as her arrest for drug possession, mother "reverted to old behaviors" by "running around" with father.  She suffered a black eye and busted lips, and thereafter skipped parenting classes and downplayed her injuries to the Department.  In June 2020, mother got into a heated argument with another woman at a party where people were smoking marijuana, and had to be physically restrained from attacking the other woman; the entire incident was recorded on video and posted to social media.

### 3. *Mother's visitation with J.W.*

Although at first mother regularly attended visits with J.W., her visits became "sporadic" after she resumed her relationship with father in February 2020, as she often failed to show for scheduled visits.

In April 2020, the COVID-19 pandemic necessitated a shift to virtual visits.  During those virtual visits, mother would sometimes become verbally aggressive in frustration over two-year-old J.W.'s disinterest in communicating over video.  On those occasions when J.W.'s caregiver declined mother's same-day requests for visits due to the caregiver's work schedule, mother sent multiple threatening text messages warning the caregiver that "the games you play would get a person smoked."

### 4. *J.W.'s well-being*

J.W. developed a loving bond with her caregiver (the maternal cousin) and the caregiver's children (J.W.'s second cousins). The caregiver also exhibited a vested interest in providing J.W. a stable, loving, and safe home.

### D. *Review hearing and termination of reunification services*

Because mother continued to "demonstrate[] highly concerning behaviors," including missing drug tests, maintaining acquaintances that exposed her drug use, making implied threats toward J.W.'s caregiver, and engaging in unsafe relationships that would place J.W. at risk, the Department recommended that the juvenile court terminate family reunification services for mother.

At the 18-month review hearing on October 8, 2020, the juvenile court acknowledged that mother's compliance with her case plan had been "partial" and "substantial," yet nevertheless concluded that J.W. still could not "safely be returned to . . . mother's care."

The court terminated family reunification services for mother and set a permanency planning hearing for February 1, 2021.[3]  (§ 366.26.)

### E. *Section 388 petition and termination of parental rights*

On January 28, 2021, mother filed a petition asking the juvenile court to modify its October 2020 order terminating family reunification services and setting a permanency planning

---

[3]     Mother filed a notice of intent to file a writ petition from the order setting the permanency planning hearing, but no writ was ever filed.

hearing. In her petition, mother cited three changed circumstances—namely, that (1) she had "enrolled in" and "attend[ed]" seven sessions of "individual counseling," (2) her "virtual visits" with J.W. had been "issue"-free since December 2020, and (3) she had "not maintained any contact with" father. The petition asserted that resuming reunification services was in J.W.'s best interests because "[i]t is in the child's interest to have more contact and further strengthen her bond with" mother.

In its December 10, 2020, report to the juvenile court, the Department reported that mother—shortly after the October 2020 hearing—had told a relative that she (mother) intended to kidnap J.W.

At the permanency planning hearing on February 1, 2021, the court summarily denied mother's petition without a hearing because (1) mother showed merely "changing circumstances, not changed circumstances," (2) the letter from the individual counselor noting that mother had made some "progress" "toward [her] goal of emotional management" was "vague as to the extent of the progress," and (3) mother's recent "threat to kidnap the child" showed that mother continued to be "aggressive."

The court then terminated mother's parental rights over J.W.

**F.    *Appeal***

Mother filed this timely appeal.

### DISCUSSION

In this appeal, mother argues that the juvenile court (1) erred in summarily denying her section 388 petition; and (2) failed to comply with the provisions of ICWA.

7

# I.   Section 388 Petition

## A.   *Applicable law*

To establish entitlement to modification of a prior juvenile order under section 388, the petitioning parent must show (1) "a change of circumstances," and (2) that the "modification of the prior order would be in the best interests of the minor child." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 (*Mickel O.*).)

The burden of making each showing rests with the parent (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461 (*Angel B.*)), and that burden is particularly heavy where, as here, reunification services have been terminated. That is because, by that time, the focus of dependency proceedings has shifted to addressing the child's need for a "'stable [and] permanent'" home rather than the parent's desire for reunification. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419-420; cf. *In re William B.* (2008) 163 Cal.App.4th 1220, 1228 [focus on reunification at the outset].) Thus, with respect to the first element, the petitioning parent must show "*changed*, not changing circumstances," because "stability for the child" is not "promote[d]" by "delaying" "the selection of a permanent home for a child" "[just] to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point." (*Mickel O.*, *supra*, 197 Cal.App.4th at p. 615; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47 (*Casey D.*), disapproved on other grounds by *In re Caden C.* (2021) 11 Cal.5th 614.) Where, as here, a parent files a section 388 petition after reunification services have been terminated, "stability and continuity" "assume[] an increasingly important role" in assessing the best interests of the child. (*Angel B.*, at p. 464; *Mickel O.*, at pp. 616-617; *In re Marilyn H.* (1993) 5 Cal.4th 295,

310 ["after termination of reunification services," "continued care [by her current caregiver] is [presumptively] in the best interest of the child"].)

The petitioning parent is entitled to a hearing on her petition if she makes a """prima facie showing"""—that is, if she alleges facts that, if accepted as true and liberally construed, demonstrate "'probable cause'" to believe she could prevail in obtaining the requested modification. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432 (*Aljamie D.*); *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413-1414 (*Jeremy W.*).) "'[G]eneral, conclusory allegations'" are insufficient to make a prima facie showing. (*In re Samuel A.* (2020) 55 Cal.App.5th 1, 7 (*Samuel A.*).) Put differently, a petition may be summarily denied only if the petition fails to """present[] any evidence""" of a change in circumstance or that a modification of the prior order would be in the child's best interests. (*Aljamie D.*, at p. 432; *Jeremy W.*, at pp. 1413-1414; see also Cal. Rules of Court, rule 5.570(d)(1).)

We review the summary denial of a section 388 petition for an abuse of discretion. (*Samuel A.*, *supra*, 55 Cal.App.5th at p. 7; *In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.)

**B.** *Analysis*

Viewed in the context of the "entire factual and procedural history of the case" (*Mickel O.*, *supra*, 197 Cal.App.4th at p. 616), the juvenile court did not abuse its discretion in summarily denying mother's section 388 petition. Even accepting and liberally construing the allegations of mother's petition, mother's petition did not demonstrate probable cause to find changed circumstances or that resuming reunification services would be in J.W.'s best interests. Mother did not present evidence that the

9

circumstances had changed between the October 2020 order she sought to modify and the filing of her section 388 petition in January 2021. Mother may have enrolled in and attended seven sessions of "individual counseling," but, as the juvenile court found, the counselor's "vague" report that mother had made "some progress" "toward [her] goal of emotional management"— even liberally construed—was not enough to demonstrate probable cause to believe that circumstances had changed, especially when that counseling did not dissuade mother from threatening to kidnap J.W. Mother's "virtual visits" may have been "issue"-free, but that was because mother had not voiced her intent to kidnap during the visits. And mother's distancing from father, while admirable, was recent and short-lived. In sum, this evidence at best demonstrated that mother's circumstances were changing, but had not yet changed. Mother also did not present evidence that resuming reunification services was in J.W.'s best interest. Mother's petition alleged that "[i]t is in a child's interest to have more contact and further strengthen her bond with mother," but this allegation is *both* too general and too conclusory to establish a prima facie case *and* ignores the increased importance of stability and continuity where, as here, the petition is filed after reunification services are terminated.

Mother resists this conclusion with what boil down to two arguments.

First, she contends that she should have a lighter burden of showing changed circumstances because the jurisdictional allegations sustained against her involve her "faulty judgment" rather than her personal infliction of physical harm upon J.W. We reject this contention. Not only does mother offer no precedent to support it, but mother's attendance at seven

10

counseling sessions (even if she made "some progress") and recent distancing from father do not amount to a prima facie showing when one considers the record as a whole, which demonstrates that mother has continued to exercise "faulty judgment" by having an on-again, off-again relationship with father; by being arrested for drug possession; by getting into altercations at parties where substances are used; and by threatening to kidnap her own child.

Second, mother argues that the COVID-19 pandemic should be considered a "changed circumstance." It is not in this case because the pandemic was ongoing at the time the juvenile court terminated reunification services in October 2020. Nor does the record support mother's related contention that her bond with J.W. was not as strong due to the shift from in-person to virtual visitation due to the pandemic. That is because mother missed in-person visits before the pandemic hit and because mother lashed out at J.W. during virtual visits.

## II. ICWA

### A. *Pertinent facts and procedural background*

#### 1. *Mother's ancestry*

Mother has no reported Indian ancestry.

#### 2. *Father's ancestry*

In February 2019, father's mother (the paternal grandmother) initially reported that J.W. may have Indian ancestry through her grandmother (the paternal great-great-grandmother), who is named Eloise J. The Department spoke to the paternal great-grandmother—Eloise J.'s daughter—who reported that the family had no Indian ancestry and refused to provide Eloise J.'s contact information because she was "80 years old and . . . not to be bothered."

11

On the basis of this information, the juvenile court determined that ICWA did not apply.

In July 2019, father reported that he "may have" Indian ancestry with the "Blackfeet" tribe. Father said that Eloise J. would have more information and provided her contact information. The Department spoke with Eloise J., who reported that (1) she never heard that her "family had Blackfoot heritage," (2) "her family believed *her* grandmother Ella M[.]" (the paternal great-great-great-great-grandmother) may have "had Native American heritage because of her long hair" and that "[s]he thinks maybe" that *her* grandfather (the paternal great-great-great-great grandfather) "could have been registered" with some tribe (but she does not know which tribe), and (3) she "is not sure whether" any of her ancestors "had Native American heritage" or "belonged to any [Native American] tribe."

After receiving this report, the juvenile court did not alter its prior conclusion that ICWA does not apply.

### B. *Pertinent Law*

ICWA was enacted to curtail "the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement." (*Miss. Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 32.) Under the ICWA and California statutes our Legislature enacted to implement it (§§ 224-224.6), as recently amended, a juvenile court—and, as its delegate, the Department—have duties all aimed at assessing whether a child in a pending dependency case is an "Indian child" entitled to the special protections of ICWA. (§ 224.2, added by Stats. 2018, ch. 833, § 5; § 224.3; *In re A.M.* (2020) 47 Cal.App.5th 303, 320 [applying ICWA law in effect at time of order appealed from].) For these purposes, an "'Indian

12

child'" is a child who (1) is "a member of an Indian tribe," or (2) "is eligible for membership in an Indian tribe *and* is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4), italics added; § 224.1, subd. (a) [adopting federal law definition].) By its terms, this definition turns "'on the child's political affiliation with a federally recognized Indian Tribe,'" not "necessarily" "the child's race, ancestry or 'blood quantum.'" (*Austin J.* (2020) 47 Cal.App.5th 870, 882 (*Austin J.*), quoting 81 Fed.Reg. 38801-38802 (June 14, 2016).)

Under ICWA as amended, the Department and juvenile court have "three distinct duties." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*D.S.*) [noting amendment's creation of three duties]; *Austin J.*, *supra*, 47 Cal.App.5th at pp. 883-884 [same].) The first duty is the initial "duty" of the Department and the juvenile court "to inquire whether [a] child is an Indian child." (§ 224.2, subds. (a) & (b).) The Department discharges this duty chiefly by "asking" family members "whether the child is, or may be, an Indian child." (*Id.*, subd. (b).) For its part, the juvenile court is required, "[a]t the first appearance" in a dependency case, to "ask each participant present" "whether the participant knows or has reason to know that the child is an Indian child." (*Id.*, subd. (c).) The second duty is the duty of the Department or the juvenile court to "make further inquiry regarding the possible Indian status of the child." (*Id.*, subd. (e).) This duty is triggered if the Department or court "has reason to believe that an Indian child is involved" (*ibid*), and, once triggered, obligates the Department to conduct further interviews to gather information, to contact the Bureau of Indian Affairs and state department of social services for assistance, and/or to contact relevant Indian tribe(s). (*Id.*, subd. (e)(2).) The third

13

duty is the duty to notify the relevant Indian tribe(s). (§ 224.3, subd. (a); 25 U.S.C. § 1912(a).) This duty is triggered if the Department or the court "knows or has reason to know . . . that an Indian child is involved." (§ 224.3, subd. (a).) The Department or juvenile court has "reason to know a child involved in a proceeding is an Indian child" in one of six statutorily defined circumstances—namely, when (1) "[a] person having an interest in the child . . . informs the court that the child is an Indian child" (§ 224.2, subd. (d)(1)), (2) "[a]ny participant in the proceeding . . . informs the court that it has discovered information indicating that the child is an Indian child" (*id.*, subd. (d)(3)), (3) "[t]he child . . . gives the court reason to know that the child is an Indian child" (*id.*, subd. (d)(4)), (4) the child or the parents reside, or are domiciled, "on a reservation or in an Alaskan Native village" (*id.*, subd. (d)(2)), (5) "the child is or has been a ward of a tribal court" (*id.*, subd. (d)(5)), or (6) "either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe" (*id.*, subd. (d)(6)).[4]

In assessing whether ICWA has been violated, we review any questions of law de novo, but review the court's ICWA

---

[4] In amendments which postdate the express ICWA finding made by the juvenile court in this case, our Legislature clarified that the Department or juvenile court "has reason to believe that an Indian child is involved" for purposes of the duty of further inquiry if the Department or court "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe," including information "indicat[ing]" but not "establish[ing]" the existence of any of the above-enumerated six circumstances. (§ 224.2, subd. (e)(1), as amended by Stats. 2020, ch. 104, § 15.)

findings for substantial evidence. (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 254; *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.)

**C.** *Analysis*

Mother argues that the Department and the juvenile court did not comply with the ICWA duty to conduct further inquiry and the ICWA duty to notify the pertinent tribe(s).

1. *Duty of further inquiry*

Substantial evidence supports the juvenile court's implicit finding that the Department properly discharged its duty of further inquiry under ICWA. As noted above, this duty is triggered if there is "reason to believe that an Indian child is involved," and obligates the Department (or juvenile court) to conduct further interviews to gather information, to contact the Bureau of Indian Affairs and state department of social services for assistance, and/or to contact relevant Indian tribe(s). (§ 224.2, subd. (e)(2).) This duty obligates the Department (or court) to follow up on viable leads (*In re K.R.* (2018) 20 Cal.App.5th 701, 709), but is discharged if the Department or court has followed up on those leads—even if the inquiry leads to persons who failed or refuse to provide information that might be helpful. (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1161; *In re K.M.* (2009) 172 Cal.App.4th 115, 119).

Here, the Department followed all available leads—father and paternal grandmother said the family might have some Native American heritage (possibly with the Blackfeet tribe) and that the paternal great-great-grandmother would know more; the paternal great-great-grandmother ultimately said that she was unaware of any Blackfeet heritage, that she was "not sure" whether the family had any Native American ancestry at all, and

15

that the most she could say is that *her* grandparents might have heritage based in part upon her grandmother's long hair. Paternal great-great-grandmother's statements left no further leads. What is more, those statements effectively *refuted* the earlier reports by father and paternal grandmother regarding the family's Native American ancestry, particularly when considered in conjunction with paternal great-grandmother's disavowal of any such heritage. (Cf. *In re T.G.* (2020) 58 Cal.App.5th 275, 294 [bare statement of Indian ancestry can sometimes trigger a duty to inquire further].) After interviewing the paternal great-great-grandmother, the Department at most had a reason *to speculate* that J.W. might be an Indian child; the Department certainly had no reason to *believe* she was. As a consequence, the Department (and the juvenile court) discharged their duty of further inquiry. (Accord, *In re J.D.* (2010) 189 Cal.App.4th 118, 124-125 [duty to inquire discharged because paternal grandmother's inability to name tribe or other possible relatives was too "speculative" to create a "reason to believe"]; *In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1468 [inability to identify tribe and failure to provide contact information to substantiated unsupported belief insufficient to trigger ICWA duties; family lore alone insufficient]; cf. *In re S.R.* (2021) 64 Cal.App.5th 303, 310, 317 (*S.R.*) [report that paternal great-grandmother was a member of Yaqui tribe, but Department does not investigate further; duty to inquiry further not discharged].)

2. *Duty to notify*

Substantial evidence also supports the juvenile court's implicit finding there was no duty to notify the tribes. As noted above, the duty to notify is triggered if the Department or the court "knows or has reason to know . . . that an Indian child is

16

involved." (§ 224.3, subd. (a).)  Because, as we have concluded, there is no reason to *believe* J.W. is an Indian child, it follows that there is no reason to *know* she is.  Although the trial court orally ordered the Department to "attempt to interview . . . Eloise J[.], and notice the Black feet tribe," the court's minute order indicated that the Department was to "provide ICWA notice *if triggered*."  We need not decide which of these pronouncements is controlling because we have concluded that there was no duty under ICWA to notify any tribe; the Department's failure to adhere to a possible order of the court that is not required by ICWA cannot itself violate ICWA.

## DISPOSITION

The order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT


We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ